UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                              )
JOHN PAUL CHARLTON,           )
                              )
        Plaintiff,            )
                              )
        v.                    )        Civil Action No. 08-0221 (PLF)
                              )
MICHAEL BRUCE DONLEY,         )
Secretary of the Air Force,   )
                              )
        Defendant.            )
_____)

OPINION

      Plaintiff John Paul Charlton seeks judicial review of the decision of the Air Force

Board for Correction of Military Records ("AFBCMR") to deny his application to correct his Air

Force records.  Defendant Michael Bruce Donley, as Secretary of the Air Force, has filed a

motion for summary judgment.  Mr. Charlton opposed that motion and filed a cross-motion for

summary judgment.  Upon consideration of the parties' papers, the relevant legal authorities, and

the entire record in this case, the Court will grant in part and deny without prejudice in part the

Air Force's motion, will deny in part and deny without prejudice in part Mr. Charlton's

cross-motion, and will remand the AFBCMR's decision to the agency for further consideration in

accordance with Part III(H) of this Opinion.[1]

---

[1]      The papers reviewed in connection with the pending motions include:  the
complaint ("Compl.") [Dkt. No. 1]; defendant's motion for summary judgment ("Def.'s Mot. for
SJ") [Dkt. No. 18]; plaintiff's opposition and cross-motion for summary judgment ("Pl.'s Mot.
for SJ ") [Dkt. No. 24]; defendant's opposition to plaintiff's cross-motion ("Def.'s Opp.")
[Dkt. No. 27]; plaintiff's reply to defendant's opposition ("Pl.'s Rep.") [Dkt. No. 30];
the administrative record ("AR") [Dkt. No. 36]; and the administrative record supplement
("AR Supp.") [Dkt. No. 39].

## I.  BACKGROUND

Mr. Charlton is a former United States Air Force Academy cadet who entered the Academy in June of 1999.  AR at 6.  In the fall of 2002, an instructor accused him of cheating by copying another student's work and of lying.  Id.  After a hearing, the Wing Honor Board ("WHB") found that Mr. Charlton cheated by copying another's work, and he was disenrolled from the Academy.  Id.  The Air Force also ordered him to reimburse it for the cost of his tuition, which amounted to approximately $136,478.  Compl. ¶ 69.  Mr. Charlton then applied to the AFBCMR to have his record corrected.  AR at 19.  Specifically, he asked the Board to remove the honor violation, give him a diploma from the Academy and a commission, and remove his obligation to repay the cost of tuition.  Id.  This application was denied on October 17, 2005.  Id. at 15.  Mr. Charlton subsequently filed a complaint with this Court against the Secretary of the Air Force.  He asks the Court to set aside the AFBCMR's decision, compel it to change his records in the ways he requested, and award him money damages in back pay and attorneys' fees. Compl. ¶ 102.

### A.  Enrollment and Health Problems

In the summer of 2001, after the end of his second school year, Mr. Charlton was temporarily stationed at Tyndall Air Force Base away from the Academy.  Def.'s Mot. for SJ at 1.  On July 20, 2001, he complained of joint pain in his hands and feet, fatigue, and intermittent laryngitis.  Id.  A physical evaluation suggested that Mr. Charlton had an autoimmune deficiency, specifically rheumatoid arthritis.  Id.  On August 16, 2001, a physician at the Academy's Rheumatology Clinic diagnosed him with small joint polyarthritis.  Id.  On

2

October 18, 2001 and November 15, 2001, he underwent follow-up examinations with

Dr. Kimberly May, who noted that his arthritis persisted.  Id. at 1-2.  Dr. May referred Mr.

Charlton for a Cadet Medical Evaluation Board ("CMEB").  Id. at 2.

A CMEB evaluates whether an active duty member of the Air Force who is

diagnosed with a potentially disqualifying illness is qualified for active duty.  Pl.'s Mot. for SJ

at 2 (citing Air Force Instruction ("AFI") 48-123 ¶ A2.1 (Jan. 1, 2000)).  It is triggered when a

physician identifies a potentially disqualifying illness in a cadet.  Id.  A CMEB panel considers

the cadet's medical record and a medical summary created by the primary care physician, and

makes a recommendation on whether the cadet's condition warrants an early departure or

medical waivers.  Id.  The CMEB panel creates a CMEB report containing its findings, which the

Command Surgeon reviews and then indicates his approval or disapproval.  Id.  The

Commandant of Cadets then reviews the compiled CMEB report and makes a final decision

concerning whether the cadet should be disenrolled, placed on medical turnback status, or kept in

the cadet wing.  Id.

Mr. Charlton's CMEB panel convened on December 14, 2001.  Def.'s Mot. for SJ

at 3.  Dr. May's summary to the panel diagnosed Mr. Charlton with symmetric small and large

joint polyarthritis, with a differential diagnosis including rheumatoid arthritis.  Pl.'s Mot. for SJ

at 2.  She noted that his fatigue was beginning to have an impact on his ability to keep up with

his studies.  Id.  Dr. May recommended that Mr. Charlton continue at the Academy while being

treated for six months with methotrexate.  Id.  A follow-up examination would determine his

response to the treatment and whether changing his commission would be appropriate.  Id.

3

The CMEB panel concurred with Dr. May's findings and determined that, while Mr. Charlton was not qualified for worldwide duty or commissioning, he was able to return to cadet activities. Def.'s Mot. for SJ at 3. The Command Surgeon and Commandant both agreed with the CMEB report, and the Commandant decided to retain Mr. Charlton in the cadet wing and re-evaluate him in May 2002. Id.

On May 6, 2002, Mr. Charlton was re-evaluated. Def.'s Mot. for SJ at 4. Dr. May noted that he had "excellent disease control" and was in "remission," although he had "intermittent minor elevations" during his methotrexate treatment. Id. Dr. May stated that Mr. Charlton would "require a repeat [CMEB] for this issue in the November timeframe." Id. She described his condition as being in "remission," id., and in a follow-up on August 9, 2002, his physician noted an "excellent response" to the medication. Id. Though he had intermittent follow-up evaluations, Mr. Charlton was never given a second CMEB. See Compl. ¶ 29.

### B. Honor Violation and WHB Hearing

During the fall 2002 semester, Major Terry Wilson, Mr. Charlton's Computer Networks instructor, accused Mr. Charlton of cheating by copying portions of two assignments and lying about receiving assistance in completing another. Def.'s Mot. for SJ at 4-5. Major Wilson and Mr. Charlton could not resolve the matter informally, and so Mr. Charlton signed a "Memorandum of Understanding" that notified him that a WHB proceeding would occur based on Major Wilson's accusation. Id. at 5.

"WHB proceedings are convened at the [Academy] to review evidence and hear testimony from the respondent and witnesses in the case, to discuss the evidence, and to make a

4

judgment as to whether or not the respondent violated the Honor Code." Def.'s Mot. for SJ at 5 (internal quotation omitted). Procedures regarding WHB hearings are codified in the Air Force Cadet Wing Honor Code Reference Handbook ("the Handbook"). See id. WHB hearings are non-adversarial, with neither side receiving representation. Id. The respondent (in this case Mr. Charlton) receives statements that will be used in the WHB hearing before it convenes and is to be given 72-hours notice of any evidence to be used. Id. The WHB has eight voting members who determine whether a violation has occurred. Id. at 6. The respondent can call and cross-examine witnesses, but all questions go through the WHB Chairman. Id. After hearing testimony and being advised of the standard of proof to apply (beyond a reasonable doubt), members deliberate and vote. Id.

Prior to his hearing, Mr. Charlton attempted to have the three separate allegations against him — that is, the two cheating charges and the one lying charge — considered at three different hearings. AR at 23. The WHB denied that request. Id. Mr. Charlton's WHB hearing began on March 5, 2003, id. at 6, and lasted for over 16 hours. Id. at 27. Major Wilson testified by telephone, a procedure to which Mr. Charlton did not object. See id. at 52-83. The WHB also called an expert witness on computer matters, Caroline Dull. Id. at 299-300. It e-mailed to Mr. Charlton Ms. Dull's background and what she generally planned to say approximately 48 hours before the hearing began. Id. After the hearing, the WHB found that Mr. Charlton had violated the Cadet Honor Code with respect to the cheating charges, but not the lying charge. AR at 6.

Pursuant to WHB procedures, Mr. Charlton's case was forwarded to the Commandant for review. Def.'s Mot. for SJ at 7-8. The Commandant decides whether a cadet should be disenrolled or put on honor probation. Id. If the Commandant recommends

disenrollment, the cadet then has the opportunity to appeal that decision to the Superintendent, who can concur with or alter the Commandant's sanction. Id. at 8. If the Superintendent determines that disenrollment is proper, he may consult with the Academy Board and then decide whether the cadet should repay his education through enlisted duty or through reimbursement. Id. The Academy Board consists of Academy leaders and is chaired by the Superintendent. Id. The Superintendent is vested by the Secretary of the Air Force with the authority to make the ultimate decision whether to disenroll the cadet. Id.

There was no Superintendent at the Academy while Mr. Charlton's case was being processed, so this procedure was not followed precisely. Def.'s Mot. for SJ at 8. On July 8, 2003, the Commandant decided to disenroll Mr. Charlton and have him transferred to enlisted active duty for three years. Id. The Commandant then forwarded his decision directly to the Secretary of the Air Force. Id. On January 5, 2004, the Secretary agreed with the Commandant's decision that Mr. Charlton be disenrolled, but decided that instead of repaying the cost of his education through service he should reimburse the Academy. Id. The reimbursement amount was determined to be approximately $136,478. Compl. ¶69. On January 12, 2004, the Air Force discharged Mr. Charlton. Id. ¶ 72.

## C. Mr. Charlton's AFBCMR Application

On August 10, 2004, Mr. Charlton filed an application with the AFBCMR. AR at 17. The AFBCMR is responsible for the correction of military records upon a finding of error or injustice. 10 U.S.C. § 1552(a); see 32 C.F.R. § 865.4(a) (referring to "material error or injustice"). Mr. Charlton sought the following corrections: (1) that he be found not to have

violated the Honor Code; (2) that he be given an academic diploma; (3) that he not be obligated to pay the cost of his education; and (4) that he be given an Air Force commission.  AR at 19.  In his application, he accused the Air Force and WHB of five errors: (1) not properly considering his rheumatoid arthritis as a basis for medical discharge; (2) failing to provide him with due process at his hearing; (3) failing to provide a mistake of fact instruction to WHB members; (4) failing to prove beyond a reasonable doubt that he violated the Honor Code; and (5) treating him inequitably at the WHB proceeding and thereafter.  Id. at 2-6.

In assessing Mr. Charlton's application, the AFBCMR received two advisory opinions: one from an AFBCMR medical consultant discussing Mr. Charlton's medical discharge allegation, AR at 494-97, and one from the Air Force Legal Office addressing his arguments more broadly.  Id. at 476-81.  Mr. Charlton responded to both advisory opinions.  Id. at 484-93, 500-10.  On October 17, 2005, the AFBCMR denied Mr. Charlton's application and stated:  "[W]e agree with the opinions and recommendations of the Air Force offices of primary responsibility and adopt their rationale as the basis of our conclusion that the applicant has not been the victim of error or injustice."  AR at 15.

As the Air Force acknowledges, a number of papers relevant to Mr. Charlton's case were never presented to the AFBCMR.  AR Supp. at 1.  These include a summary of the WHB proceedings, the Memorandum of Understanding that Mr. Charlton signed, and letters from the Commandant and Secretary of the Air Force with their sanction recommendations.  See generally AR Supp.  While the parties still presented much of the information contained in these documents to the AFBCMR (primarily through providing it with a transcript of the WHB hearing and with briefs in support of their positions), the Board did not see evidence establishing that the

Commandant forwarded his sanction recommendation directly to the Secretary of the Air Force

instead of to the (non-existent) Superintendent.

## II.  STANDARD OF REVIEW

Mr. Charlton now seeks judicial review of the AFBCMR's decision on the

grounds that (1) the decision was arbitrary, capricious, an abuse of discretion, unsupported by

substantial evidence, or otherwise contrary to law; and (2) the AFBCMR's action was contrary to

Air Force regulations and violated his constitutional right to due process of law.  Compl.

¶¶ 88-101.

> As the Court stated in its previous Opinion in this case:

> [Mr. Charlton] characterizes his claim as one brought under the
> Administrative Procedure Act, but, in addition to his demand for
> injunctive relief, he also seeks money damages which are not
> available under the APA.  The Little Tucker Act permits certain
> claims for money damages against the United States government,
> including those related to applications for correction of military
> records.

Charlton v. Donley, 611 F. Supp. 2d 73, 75 (D.D.C. 2009) (citations omitted).  The  Court

therefore will again "construe the complaint as one that asserts claims under the Little Tucker

Act as well as under the APA."  Id.  On August 17, 2009, the Air Force filed for summary

judgment, and on February 8, 2010, Mr. Charlton filed a cross-motion for summary judgment.

The parties' cross-motions are ripe for decision.

Summary judgment may be granted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED.

R. CIV. P. 56(a).  In a case involving review of a final agency action under the Administrative

Procedure Act, 5 U.S.C. § 706, however, the Court's role is limited to reviewing the administrative record; the standard set forth in Rule 56 does not apply.  See Catholic Health Initiatives v. Sebelius, 658 F. Supp. 2d 113, 117 (D.D.C. 2009), rev'd on other grounds, 617 F.3d 490 (D.C. Cir. 2010); Cottage Health System v. Sebelius, 631 F. Supp. 2d 80, 89-90 (D.D.C. 2009).  "Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'"  Catholic Health Initiatives v. Sebelius, 658 F. Supp. 2d at 117 (quoting Cottage Health System v. Sebelius, 631 F. Supp. 2d at 90).  Summary judgment thus serves as "the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review," but the normal summary judgment standard does not apply.  Cottage Health Systems v. Jebelius, 631 F. Supp. 2d at 90; see also Fuller v. Winter, 538 F. Supp. 2d 179, 185 (D.D.C. 2008); Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995).

As in the case of other federal agencies, a court may overturn a decision of the AFBCMR only if it is either "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or not supported by substantial evidence in the record.  5 U.S.C. § 706(2)(A), (E); see Frizelle v. Slater, 111 F.3d 172, 176 (D.C. Cir. 1997); Kreis v. Sec'y of the Air Force, 866 F.2d 1508 at 1514 (D.C. Cir. 1989); Mudd v. Caldera, 26 F. Supp. 2d 113, 120 (D.D.C. 1998).  This standard of review, however, "is particularly narrow when dealing with the actions of the armed forces and their agencies."  Washington v. Donley, 802 F. Supp. 2d 539, 546 (D. Del. 2011); see Mudd v. Caldera, 26 F. Supp. 2d at 120.  Because the statute authorizing

9

the Secretary of the Air Force to correct records gives him — and his delegated agent, the

AFBCMR — a great deal of discretion, the arbitrary and capricious standard is even more

difficult to meet than it is in other cases brought under the APA: judicial review is under an

"unusually deferential application of the 'arbitrary and capricious' standard." Cone v. Caldera,

223 F.3d 789, 793 (D.C. Cir. 2000); see Kreis v. Sec'y of the Air Force, 866 F.2d at 1514 ("It is

simply more difficult to say that the Secretary has acted arbitrarily if he is authorized to act

'when he considers it necessary to correct an error or remove an injustice' than it is if he is

required to act whenever a court determines that certain objective conditions are met." (citations

omitted)).

Nevertheless, judicial review under this deferential standard must be

"meaningful." Washington v. Donley, 802 F. Supp. 2d at 546 (stating that "a court is 'not

empowered to rubber-stamp'" a challenged AFBCMR decision) (quoting NLRB v. Adam & Eve

Cosmetics, 567 F.2d 723, 727 (7th Cir. 1977)). Consequently, a plaintiff can prevail on his claim

that the Board's decision-making process violated the APA if he can establish that (1) the

AFBCMR did not consider or respond to an argument made by the plaintiff that is not "frivolous

on its face," or (2) the basis of the decision is not supported by evidence anywhere in the record.

Frizelle v. Slater, 111 F.3d at 176-78; Mudd v. Caldera, 26 F. Supp. 2d at 120.

While the AFBCMR must address all non-frivolous arguments presented to it, the

agency's discussion of those arguments "[need not] be a model of analytic precision to survive a

challenge." Frizelle v. Slater, 111 F.3d at 176 (internal quotation marks and citation omitted);

see Washington v. Donley, 802 F. Supp. 2d at 549 (The AFMCMR "is not required to spell out

the minutiae of its logic in reaching a decision; it is sufficient if there is enough evidence to allow

10

the Court to discern how the Board reached its decision."). "A reviewing court will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Frizelle v. Slater, 111 F.3d at 176; see Washington v. Donley, 802 F. Supp. 2d at 546.

Similarly, an agency is not required to address arguments that have not been asserted by the parties. See Coburn v. McHugh, 744 F. Supp. 2d 177, 182-83 (D.D.C. 2010) (rejecting APA claim based on arguments never presented to or addressed by AFBCMR). "It is a hard and fast rule of administrative law . . . that issues not raised before an agency are waived and will not be considered by a court on review." Nuclear Energy Inst., Inc. v. EPA, 373 F.3d 1251, 1297 (D.C. Cir. 2004).

In evaluating agency decisions, a reviewing court must take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. The harmless error rule applies because "[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration." Jicarilla Apache Nation v. US Dep't of Interior, 613 F.3d 1112, 1121 (D.C. Cir. 2010) (quoting PDK Labs. Inc. v. U.S. Drug Enforcement Administration, 362 F.3d 786, 799 (D.C. Cir. 2004)). The question whether an error was prejudicial is contextual; a case-specific application based upon an examination of the entire record is required. Id. When the party challenging agency action fails to show that the agency's error may have affected the outcome of the proceedings, vacating and remanding the judgment is inappropriate. Id.

Finally, the Air Force, like all agencies, generally is bound to follow its own regulations to avoid a due process violation. See Frizelle v. Slater, 111 F.3d at 1277. "[A] fair and impartial process is essential to the due process rights of military personnel faced with

discharge from their military service." <u>Stainback v. Mabus</u>, 671 F. Supp. 2d 126, 138 (D.D.C.

2009) (citing <u>VanderMolen v. Stetson</u>, 571 F.2d 617, 626-28 (D.C. Cir. 1977)).   When reviewing

military agency decisions for due process violations, courts accord those agencies a high level of

deference, accepting "an agency's interpretation of its own regulation . . . 'unless it is plainly

wrong.'"  <u>Castlewood Prods. v. Norton</u>, 365 F.3d 1076, 1082 (D.C. Cir. 2004) (quoting <u>Gen.</u>

<u>Elec. Co. v. EPA</u>, 53 F.3d 1324, 1327 (D.C. Cir. 1995)).

## III.  DISCUSSION

Mr. Charlton asserts that the AFBCMR's decision should be overturned because it

was (1) arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or

otherwise contrary to law; and (2) contrary to Air Force regulations and in violation of his

constitutional right to due process of law.  Compl. ¶¶ 88-101.  He asserts that the AFBCMR

decision is in error because (1) the Air Force failed to conduct a second CMEB on him as was

initially planned; (2) he should have been medically discharged after developing rheumatoid

arthritis in the fall of 2002; (3) he developed his medical condition before his third year at the

Academy, and so it should have been evaluated according to the standards for induction and not

retention; (4) the WHB refused to have three separate proceedings to defend against the three

honor accusations and instead combined them into one; (5) the WHB hearing proceeded with

Major Wilson appearing by telephone instead of in person; (6) Mr. Charlton was not provided

with sufficient legal assistance, including legal counsel and an expert consultant prior to and

during the WHB hearing; (7) the WHB was not given a mistake of fact instruction; and (8) the

lack of a Superintendent meant that the Commandant forwarded his determination to the

Secretary of the Air Force for review instead of someone in the Superintendent role, thus depriving Mr. Charlton of a fair review of his case.  Id. ¶¶ 91-98.  Three of these arguments were raised by Mr. Charlton only in his complaint and were not argued in his motion or opposition: that he should have been medically discharged prior to the fall of 2002; that he was not provided with sufficient legal assistance; and that the WHB was improperly not given a mistake of fact instruction.

Mr. Charlton raised two additional arguments in his cross-motion: that he was not properly notified of the evidence that would be used against him; and that the AFBCMR improperly rejected his claim that the WHB lacked sufficient evidence to prove beyond a reasonable doubt that he violated the Honor Code.  Pl.'s Mot. for SJ at 16-17, 20-22.  Neither contention was expressly alleged in his complaint, although assertions of fact supporting them appear at various points.  While arguments not raised consistently in complaints and motions create notice issues for the other party, the Air Force has responded to all of Mr. Charlton's claims in its own briefs, and so the Court will exercise its discretion to consider them.  See Goodrich v. Teets, 510 F. Supp. 2d 130, 142-43 (D.D.C. 2007) (exercising discretion to hear claims raised in a complaint but not in a motion for summary judgment).

With respect to all of Mr. Charlton's claims — except his argument that his case received improper review because there was no Superintendent — the Court concludes that the AFBCMR's decision was not arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or in violation of law, Air Force regulations, or due process.  The Court therefore will grant the Air Force's motion for summary judgment on all such claims.  Regarding the improper review argument, the Court holds that the portions of the record not provided to the

13

AFBCMR kept it from being able to properly reach a conclusion on whether the absence of

Superintendent review and recommendation prejudiced Mr. Charlton.  The Court therefore will

deny without prejudice the parties' cross-motions on this claim and will remand this case to the

AFBCMR for further consideration of that one issue.

### A.  Mr. Charlton's Medical Condition

Mr. Charlton argues that the Air Force violated its regulations and thus his due

process rights in regard to his medical condition because (1) it did not perform a second CMEB

as initially planned; (2) it should have given him a medical discharge; and (3) his medical

condition arose before the beginning of his third year, and it therefore should have been

evaluated according to the standards for induction, not retention.  Compl. ¶¶ 91-93.

Mr. Charlton's third argument is easily disposed of.  The Air Force cites the

relevant regulation concerning how medical conditions are evaluated.  Def.'s Mot. for SJ at 20

(citing AFI 48-123 ¶¶ 7.2.2.6, 7.2.3 (Jan. 1, 2000)).  That regulation states that a condition is

judged under the standard for induction if it arises *within* the cadet's first two years of service,

not *before* the beginning of his third year, as Mr. Charlton suggests.  AFI 48-123 ¶¶ 7.2.2.6, 7.2.3

(Jan. 1, 2000).  Mr. Charlton's physician noted that his condition developed two weeks before

July 20, after his second year of service had already ended.  AR at 307.  His arthritis therefore

was evaluated under the proper standard.

Mr. Charlton's arguments that the AFBCMR's decision should be overturned

because he did not receive a second CMEB or a medical discharge also are unpersuasive.  Pl.'s

Mot. for SJ at 22-23.  When the AFBCMR considered Mr. Charlton's application, it had a

BCMR medical consultant evaluate his claims regarding his arthritis.  AR at 11-12.  That consultant suggested that, although Mr. Charlton did not receive a second CMEB, physicians conducted periodic follow-up examinations on him and that performing these periodic follow-ups in lieu of a CMEB is routine.  Id.  The consultant also stated that under the standard for retention, which was the appropriate one for Mr. Charlton, rheumatoid arthritis is not cause either for discharge or for referral to a CMEB without "a substantiated history of frequent incapacitating episodes supported by objective and subjective findings" — which Mr. Charlton did not have.  Id. at 12 (internal quotation omitted).

It is not this Court's role to weigh the evidence and make its own determination concerning whether Mr. Charlton was entitled to a second CMEB or a medical discharge.  See Catholic Health Initiatives v. Sebelius, 658 F. Supp. 2d at 117.  The Court's task is to determine whether the conclusion the AFBCMR reached, given the evidence presented to it (including the report of the medical consultant), was arbitrary or capricious, or in violation of Air Force regulations.  Id.  The Air Force and the consultant presented enough evidence to allow the Board to reasonably conclude that not giving Mr. Charlton a second CMEB was in line with protocol, and that he was not entitled to a medical discharge.  Mr. Charlton cites no regulation stating that once a physician recommends a second CMEB, that decision cannot be altered later depending on the patient's condition.  The AFBCMR's decision was not arbitrary or contrary to Air Force regulations.

### B.  Resolving the Three Claims in a Single Proceeding

Mr. Charlton argues that the WHB's refusal to separately hear the three claims against him made his hearing unfair, and that the AFBCMR's determination to uphold that decision therefore was a violation of his due process rights.  Pl.'s Mot. for SJ at 13-14.  The Air Force argues, as it did before the AFBCMR, that "[no rule or regulation] requires multiple boards for honor allegations that stem out of the same incident."  AR at 478.  The Air Force Honor Division Chief, who "oversees the honor process" and "acts as a spokesperson on the operation of the honor system," stated that when "the [person bringing the complaint] and [respondent] are the same and the circumstances are related," a WHB will hear multiple allegations in one proceeding.  Def.'s Mot. for SJ at 23 & n.12.  Since each of the three allegations involved Mr. Charlton and Major Wilson, and they all involved cheating by copying another's work or lying about receiving assistance on homework in the same class, the WHB reasonably relied on the Honor Division Chief's comments and consolidated the complaints.  The AFBCMR agreed with the WHB's assessment, and this Court does not find that decision arbitrary or capricious.

Mr. Charlton argues that the decision created an inequitable hearing because it extended its length, and thus violated due process.  Pl.'s Mot. for SJ at 13-14.  The Court is not convinced.  Although a 16-hour hearing in a single day (from 7:30 a.m. until 11:30 p.m.) is certainly not ideal for any of the participants, it does not violate any law, regulation or established procedure; nor does it implicate due process concerns.  The decision to consolidate the claims was made reasonably in light of the advice of the Honor Division Chief.  The Court therefore finds no due process violation in the consolidation of the three claims against Mr. Charlton.

### C.  Major Wilson's Appearance By Telephone

Mr. Charlton argues that Major Wilson's appearance by telephone at the WHB hearing, instead of being physically present, violates Air Force regulations.  Pl.'s Mot. for SJ at 18-19.  He points to the Handbook, which states that the person bringing a case (the "initiator") must be "present" to testify, reading the word "present" to require physical presence.  The Air Force interprets the word "present" more broadly, and argues that initiators should be treated like other witnesses.  Def.'s Mot. for SJ at 23-24.  It points out that some rules regarding initiators appear in a paragraph of the Handbook dealing with witness issues.  Def.'s Opp. at 9 (citing Handbook ¶ 2.7.6.5.1).  It cites to the section of the Handbook governing witness presence, which states that "[e]very reasonable effort will be made to hear the verbal testimony of witnesses (in person, telephone, teleconferencing, etc.)," arguing that the same applies to initiators.  Def.'s Mot. for SJ at 23-24; Handbook ¶ 2.7.6.5.1.1.  In the absence of a regulation treating initiators differently from other witnesses or explicitly stating that initiators must be physically present, the Court concludes that the Air Force's interpretation of its regulations is not "plainly wrong," <u>Castlewood Prods/ v. Norton</u>, 365 F.3d at 1082, and thus does not violate Mr. Charlton's due process rights.[2]

### D.  Lack of Legal Counsel or an Expert Witness

In his complaint, Mr. Charlton argues that his inability to receive legal counsel prior to and during the proceeding and the WHB's refusal to provide him with his own expert witness violated his due process rights.  Compl. ¶ 96.  Although Mr. Charlton does not make the

---

[2]      The Court also notes that Mr. Charlton did not object at or before his WHB hearing to Major Wilson testifying by telephone.  <u>See</u> AR 52-83.

17

argument again in his briefs, the Air Force responds to it in its summary judgment motion that no regulation in the Handbook for WHB proceedings requires that a respondent be provided with legal counsel or with an expert witness.  Def.'s Mot. for S.J. at 25.  Although the Handbook *permits* respondents to seek third party counsel and to call his own witnesses, Mr. Charlton was informed of these rights by the WHB and chose not to exercise them.  Id. (citing AR at 513-14).  In the absence of any evidence that the Air Force violated regulations by not providing legal counsel or an expert, the Court finds no due process violation.

### E.  Mistake of Fact Defense

Mr. Charlton asserts in his complaint that the WHB's failure to give the instruction to consider his mistake of fact defense is another violation of his due process rights.  Compl. ¶ 97.  Again, he does not make this argument in his briefs, but the Air Force responds to it in its motion for summary judgment.  Def.'s Mot. for SJ at 26.  The Air Force argues that since WHB proceedings are administrative and not a court-martial or a civilian trial, specific jury instructions are not required, and no regulation suggests that they are.  Id.  It also points out that Mr. Charlton did raise his mistake of fact argument during the hearing, and that the WHB was permitted to consider it in its deliberations.  Id. (citing AR at 479).  As Mr. Charlton provides no evidence to contradict this assertion and the record supports it, the Court finds no due process violation.

### F.  Lack of Notice of Evidence

Mr. Charlton argues that the WHB violated his due process rights by not giving him 72 hours notice before his hearing of all of the witnesses to be called and the content of their

testimony.  Pl.'s Mot. for SJ at 16-17; AR at 27.  The Handbook states that respondents, like Mr.

Charlton, must be given 72 hours notice of all statements that will be used as evidence in the

proceedings.  Pl.'s Mot. for SJ at 16-17 (citing Handbook ¶ 2.7.3).  The same is true for new

evidence provided by people other than the respondent.  Id. (citing Handbook ¶ 2.7.4).  Caroline

Dull, an "expert in the area of [Internet] research," served as the Board's authority on computer

matters in his case.  AR at 300.  On March 3, 2003, the chairperson of the WHB sent Mr.

Charlton an e-mail in which Ms. Dull discussed generally what she planned to say at the hearing.

Id.  His WHB hearing began on March 5, 2003, less than 72 hours later.  AR at 6, 31.

        The Court finds this error to be harmless.  Mr. Charlton has not demonstrated or

even suggested any specific way in which he was prejudiced by losing a day in which to prepare

for Ms. Dull's testimony.  He only repeats that "[he] did not receive appropriate notice of Ms.

Dull's testimony" and "[t]herefore, the WHB violated [the] Handbook regulation."  Pl.'s Rep.

at 11.  Moreover, as both parties point out, Ms. Dull's testimony in many respects actually

supported Mr. Charlton's case.  Id.; Def.'s Opp. at 11 (citing AR at 83-86).  The burden is on Mr.

Charlton to show that the WHB's error (and thus the AFBCMR's decision to uphold it) was

prejudicial, and he has not done so.  This Court therefore finds no due process violation on this

claim.

### G.  Failure of Proof

        Mr. Charlton argues that the AFBCMR acted arbitrarily because it did not

determine that the WHB did not have sufficient evidence to find him guilty beyond a reasonable

doubt.  Pl.'s Mot. for SJ at 20-22.  The Air Force correctly points out that Mr. Charlton

essentially asks the Court to undertake its own review of the evidence, which is not the proper role of a reviewing court under the APA.  Def.'s Opp. at 11-12; see Catholic Health Initiatives v. Sebelius, 658 F. Supp. 2d at 117.  The Court's function is to look at the evidence presented to the AFBCMR and to determine that it considered the record before it, and that the conclusion it reached was supported by the record.  See id.  The Board considered and summarized Mr. Charlton's and the Air Force's arguments and evidence, and ultimately ruled for the Air Force. The Court does not find that determination arbitrary or capricious, especially given the high level of deference to be accorded to AFBCMR decisions.  See Kreis v. Sec'y of the Air Force, 866 F.2d at 1514.

### H.  No Superintendent Review

Mr. Charlton argues that the Air Force did not follow its regulations because no Superintendent made a final review of his case and determined that he should be disenrolled. Compl. ¶ 98; AR at 35, 492-93.  A plain reading of the Handbook makes clear that if the cadet appeals the Commandant's decision, the Superintendent is to review that decision and either affirm it or alter it, after conferring with the Academy Board if he so chooses.  Pl.'s Mot. for SJ at 15 (citing Handbook ¶ 2.8.3.4.1).  In Mr. Charlton's case, the Commandant reviewed the WHB's decision and, because there was no Superintendent at the Academy at that time, he forwarded his recommendation directly to the Secretary of the Air Force, who ultimately decided to disenroll Mr. Charlton and require reimbursement of tuition.  Def.'s Mot. for SJ at 8.

In the procedural history that the Air Force submitted to the AFBCMR, the Air Force stated: "On 5 August 2003, the *Superintendent* reviewed the findings of the [WHB] and all

of the applicant's additional appeal matters and directed that the applicant be disenrolled and ordered to financially reimburse the government for the cost of his Academy education."  AR at 476 (emphasis added); see also id. (the Air Force, stating to the AFBCMR, that "[o]n 5 January 2004, the Secretary of the Air Force upheld the *Superintendent's* decision . . . .").  The AFBCMR adopted this sentence verbatim in its Statement of Facts.  See id. at 6.  It is unclear if the Air Force actually meant to refer to the Commandant instead of the Superintendent, but this sentence is the only place where the Air Force discussed the procedural history of the case in its presentation to the AFBCMR.  It is plainly inaccurate.  And even if the Air Force had been referring to the Commandant, the sentence is still inaccurate: the Commandant recommended that Mr. Charlton repay his education through enlisted service — *not* through financial reimbursement.  Compare Def.'s Mot. for SJ at 9 (citing AR 524, 525), with AR at 476.  The Secretary disagreed with the Commandant's proposed sanction and instead required financial reimbursement.  See Def.'s Mot. for SJ at 9 ("The Secretary . . . disagreed with the Commandant's recommendation to transfer Plaintiff to enlisted active duty. . . . Instead, the Secretary . . . determined that Plaintiff would be required to reimburse the United States for the cost of his education.").  Thus, the AFBCMR necessarily was left with the inaccurate impression, as reflected in its Statement of Facts, that normal procedures were followed, and that the Secretary affirmed *in full* the decision of the (non-existent) *Superintendent*.  See AR at 6-7, 476.

Further complicating matters, the Air Force did not provide the AFBCMR with all of the files regarding Mr. Charlton's case.  See AR Supp. at 1 (Air Force records custodian stating: "I cannot explain why [certain records] were not forwarded to the AFBCMR . . . or otherwise provided to the AFBCMR.").  Among these missing files are the letters signed by the

Commandant and the Secretary of the Air Force, through his designee, sanctioning Mr. Charlton. Id. at 522-24, 525.  These letters show that the Commandant acted in both his own role and in the role of Superintendent.  Id. at 522-24.

Finally, in the AFBCMR's decision, the Board stated: "We agree with the opinions and recommendations of the Air Force offices of primary responsibility and adopt their rationale as the basis of our conclusion that the applicant has not been the victim of error or injustice."  AR at 15.  The Court notes that the references to "Air Forces offices," and "their rationale" are in the plural, further suggesting that the AFBCMR believed that both the Commandant and the Superintendent had made decisions.  But that was not the case.

In summary, the AFBCMR was wholly unaware of the absence of a Superintendent in the decision-making process, and the Board made its decision without certain relevant records.  See Stainback v. Mabus, 671 F. Supp. 2d at 134 ("[M]eaningful review of agency action . . . presumes the accuracy of the administrative record presented to it.").[3]  The Court therefore will deny the parties' cross-motions on this claim and will remand the case to the AFBCMR for further consideration of this one issue in light of the complete record, including the files never previously provided to the AFBCMR.  See Albino v. United States, 93 Fed. Cl. 405, 409 (Fed. Cl. 2010) ("To the extent that evidence may not have been — or, in fact, was not — considered below by the AFBCMR, the 'proper course . . . is to remand to the agency for additional investigation or explanation.'") (quoting Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985)) (alteration in original).  On remand, the AFBCMR is free to reject Mr.

---

[3]     While the Air Force provides reasons for the lack of Superintendent review in its various papers before this Court, the Court is bound to consider only what was a part of the Administrative Record.  Nuclear Energy Inst., Inc. v. EPA, 373 F.3d at 1297.

Charlton's argument regarding the absence of a Superintendent in the review process, but

"'it must expressly indicate that it has done so,'" address the issue of prejudice, and otherwise

"'explain its rationale.'"  <u>Pettiford v. Secretary of the Navy</u>, 774 F. Supp. 2d 173, 185 (D.D.C.

2011) (quoting <u>Calloway v. Brownlee</u>, 366 F. Supp. 2d 43, 55 (D.D.C. 2005)).

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant in part and deny without prejudice

in part the Air Force's motion for summary judgment [Dkt. No. 18], and deny in part and deny

without prejudice in part Mr. Charlton's cross-motion for summary judgment [Dkt. No. 25].  The

decision of the AFBCMR is remanded to the agency for further consideration in accordance with

Part III(H) of this Opinion.  An Order consistent with this Opinion will issue this same day.

SO ORDERED.


　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　　　PAUL L. FRIEDMAN
DATE:  March 5, 2012　　　　　　　　　United States District Judge